# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Estate of LINDA ROBERDEAUX.

---

DENNIS ROBERDEAUX, SR., Personal
Representative,

      Plaintiff-Appellant,

v

EVANGELICAL HOMES OF MICHIGAN, doing
business as EVANGELICAL HOME-SALINE,
and MICHIGAN SPORTS MEDICINE &
ORTHOPEDIC CENTER,

      Defendants,

and

WASHTENAW MEDICINE, P.C., doing business
as WASHTENAW INTERNAL MEDICINE
ASSOCIATES, CHERYL A. HUCKINS, M.D.,
and MARK A. KELLEY, M.D.,

      Defendants-Appellees.

UNPUBLISHED
October 18, 2016

No. 323802
Washtenaw Circuit Court
LC No. 13-000675-NH

---

Before: SERVITTO, P.J., and WILDER and BOONSTRA, JJ.

PER CURIAM.

In this medical malpractice matter, plaintiff, as personal representative of the Estate of Linda Roberdeaux (hereinafter Linda or Linda Roberdeaux), appeals as of right the trial court's order dismissing with prejudice defendant, Evangelical Homes of Michigan, d/b/a Evangelical Home-Saline (hereinafter "Evangelical Saline"). Plaintiff also appeals from the judgment of no cause for action entered in favor of defendants, Washtenaw Medicine, P.C., d/b/a Washtenaw Internal Medicine Associates, P.C. (hereinafter "Washtenaw"), Cheryl Huckins, M.D., and Mark A. Kelley, M.D. We affirm in part, reverse in part, vacate in part, and remand for further proceedings consistent with this opinion.

-1-

# I

This case arises from Linda Roberdeaux's death on October 14, 2009, from a pulmonary embolism. Linda underwent a total left knee replacement surgery on August 28, 2009, which was performed by Dr. Kelley. On August 31, 2009, Dr. Kelley ordered a venous Doppler study of Linda's leg based on her complaints of pain in her left calf and swelling. The Doppler did not reveal any sign of a blood clot.

Linda was discharged from the hospital on August 31, 2009, and moved to Evangelical Saline, a nursing facility, where she was treated by Dr. Huckins, an internal medicine physician. Dr. Huckins ordered another Doppler for Linda on September 8, 2009, because she had increased pain and swelling in her left calf.

Dr. Huckins's note in the records from September 9, 2009, indicated "Doppler left negative." She did not recall when and if she reviewed the report from the Doppler, although she testified that it would have been her practice to do so. The Doppler report indicated that there was no clot in the veins in the thigh, several veins were incompletely visualized, the exam was incomplete, and "isolated tibial vein thrombosis" could not be ruled out. Dr. Huckins believed this meant that even though certain veins were not well-visualized, "the physician reading the report did not feel that there was a question about those veins." Dr. Huckins testified that the Doppler was negative for the vessels that she was most concerned about. After reviewing the results of the Doppler, the contents did not cause her to change her care of Linda because it was her practice to follow up clinically with patients in similar situations and order a Doppler if there was any change in the patient's condition. There was no medical reason to place Linda on therapeutic anticoagulation medication. There is a risk-benefit analysis that must be conducted in deciding whether to administer anticoagulation therapy because of the risk of bleeding.

Linda traveled from Evangelical Saline to her first follow-up visit with Dr. Kelley on September 10, 2009. The purpose of the appointment was, in part, to check the wound and remove staples. Linda did not tell Dr. Kelley that she had a Doppler or had pain or swelling in her leg. Dr. Kelley also did not know that a Doppler had been performed, but he testified that he would not expect to be informed every time a doctor at Evangelical Saline ordered a Doppler. Moreover, Linda did not have any of the symptoms that she had complained of on September 8, 2009, her calves were soft, and she did not complain of pain or swelling.

Linda was discharged from Evangelical Saline and returned home on September 18, 2009. She visited Dr. Kelley again on September 28, 2009, October 8, 2009, and October 13, 2009. Dr. Kelley observed no signs of blood clots on September 28, 2009, and Linda did not complain of any pain, tenderness, or redness. The October 8, 2009 visit was unscheduled, and Linda had pain and redness around the scar, but she did not have swelling or tenderness in her calf.

According to Linda's mother, Theresa Collins, Linda visited Collins at least every other day after she returned home. Theresa Jackson, a licensed practical nurse (LPN) who assisted Collins daily, testified that she saw Linda at Collins's home on October 12, 2009, two days before her death. When Linda arrived, she was grimacing and indicated that she was in pain. Jackson observed Linda's legs and saw swelling on the left knee, calf, and ankle. Jackson

encouraged Linda to discuss these issues with her doctor the next day. Linda's records from physical therapy on October 12, 2009, however, did not indicate that she had complaints of pain or swelling on that date.

At Linda's visit with Dr. Kelley on October 13, 2009, Linda had stiffness in the knee joint, but the redness was going away. Her leg was not warm or swollen. Dr. Kelley and Linda discussed Linda's plans to go to Florida and Dr. Kelley told Linda that she could travel to Florida. However, he did not clear her for Florida at that appointment and she was scheduled to see him again the next week. According to Dr. Kelley, if at any time Linda had exhibited any clinical signs or symptoms of a clot, or she had complained of pain or swelling, he would have ordered a Doppler. Linda visited Collins after her appointment on October 13, 2009.

Plaintiff, Linda's husband, testified that, at 11:00 p.m. on the night before her death, Linda "seemed okay." On the morning of October 14, 2009, Linda was nonresponsive when plaintiff tried to wake her up. Plaintiff called 911 and began performing CPR, but he believed she had already passed away. Plaintiff testified that he called Dr. Kelley that day and had a brief conversation with him in which plaintiff asked Dr. Kelley some questions. Dr. Kelley recalled plaintiff calling his office, but he did not recall plaintiff asking him questions, only informing him that Linda had passed away. According to plaintiff, the swelling in Linda's leg never went down after the surgery.

On July 3, 2013, plaintiff filed this medical malpractice action against defendants,[1] alleging that, despite Linda having experienced deep vein thrombosis (DVT) and/or pulmonary embolism before her death, her condition was not properly or timely diagnosed and treated. He further alleged that both Dr. Kelley and Dr. Huckins knew or should have known about Linda's risk factors, signs, and symptoms for DVT or pulmonary embolism. Plaintiff asserted that both doctors were negligent in failing to take further action after the Doppler study performed on September 9, 2009, which did not adequately rule out DVT. He claimed that, on October 13, 2009, Dr. Kelley told Linda that she had blood clots, but she did not need to worry because the clots would not travel to her lungs. Plaintiff claimed also that Dr. Kelley admitted, in the telephone conversation with plaintiff on October 14, 2009, that he had told Linda during the last visit that she had blood clots in her leg. Plaintiff alleged that defendants breached the standard of care resulting in Linda's death of a pulmonary embolism and that appropriate treatment and care would have prevented her death. Plaintiff sought economic and noneconomic damages.

Before trial, Dr. Kelley filed a motion to exclude hearsay. Specifically, Dr. Kelley sought to preclude plaintiff's testimony that Linda told him, after her visit with Dr. Kelley on October 13, 2009, that Dr. Kelley had said she had clots in her legs, but she should not worry about them because they would not move. Dr. Kelley denied making such statement and argued that the testimony was double hearsay that was not admissible under any exception to the hearsay rule. Plaintiff responded that the motion was premature and that he did not intend to offer any hearsay statements at trial.

---

[1] The trial court granted defendant Michigan Sports Medicine & Orthopedic Center's motion for summary disposition and dismissed the complaint against it.

Also before trial, plaintiff filed a motion to strike or disqualify Dr. Huckins's expert, Dr. John Voytas, from testifying at trial. Plaintiff argued that Dr. Huckins was board-certified in internal medicine and, at the time of the alleged malpractice, was practicing in the specialty area of internal medicine. He argued that Dr. Voytas did not meet the requirement of MCL 600.2169(1)(b) that, during the year before the alleged malpractice, the expert must have devoted a majority of his professional time to the active clinical practice of the specialty at issue. Plaintiff claimed that, during the relevant time, Dr. Voytas was board-certified in geriatric medicine and devoted a majority of his professional time to the clinical practice of geriatric medicine. Plaintiff argued that, while Dr. Huckins may claim that Dr. Voytas's geriatric practice overlaps with the field of internal medicine, geriatrics and internal medicine are two distinct specialties, or branches of medicine in which one can potentially become board-certified. Plaintiff cited and attached portions of deposition testimony of Dr. Voytas from 2009 in an unrelated case, as well as portions of Dr. Voytas's deposition testimony in this case.

In the unrelated case, Dr. Voytas testified that from 1984 to 1993 he was employed as an internal medicine physician. In 1994, he left the internal medicine practice, completed a mid-career geriatrics fellowship, and accepted a position in the Division of Geriatrics at Beaumont Hospital. He testified that internal medicine "involves the evaluation and management of medical conditions primarily in the adult," but internists "may also see some older patients either in their offices or in the hospital." Dr. Voytas also testified that "most geriatricians are internal medicine [doctors] by training." In 2009, Dr. Voytas spent two-thirds of his time as a medical director in the nursing home business and one-third of his time as a program director at Beaumont Hospital, training other physicians how to care for elderly patients.

In his deposition in this case, Dr. Voytas testified as follows:

*Q*. Now, you have been listed as a geriatric physician; is that right?

*A*. An internist and geriatrician, yes.

*Q*. A geriatrician, is that something that has its own -- you had a fellowship in that particular area, didn't you?

*A*. Yes, I took a fellowship.

*Q*. If I understand it, sir, from your prior testimony that I have read, that in 1994 you left the internal medicine practice and completed a mid-career geriatrics fellowship at the Medical College of Pennsylvania; is that correct?

*A*. Correct.

*Q*. And since 1994 you have been doing geriatric medicine since?

*A*. Predominantly. I mean I have ages that are under 65, if you consider 65 the beginning of geriatrics, but the predominance has been people 65 and older.

*Q.* But your testimony has been that since that time, after taking your fellowship and being board certified as a geriatrician, greater than 50 percent of your practice has been regarding geriatric medicine?

*A.* Correct, 65 and older.

* * *

*Q.* Okay. In prior testimony, sir, you have indicated that the majority of your practice is as a geriatric physician. Is that still true?

*A.* Taking care of people over 65, if you call that geriatrics, yes.

*Q.* In your prior testimony you have indicated that the majority of your practice is geriatrics; is that correct?

*A.* Correct.

*Q.* And that was true in the years we are talking about, 2009.

*A.* Correct.

*Q.* And also in 2008, right?

*A.* Correct.

Dr. Voytas also testified that he is board-certified in geriatric medicine and most of his clinical work is in a nursing home environment, where the average age is approximately 82. He testified that, in 2008 and 2009, he had a full-time practice of geriatric medicine. During that time, he saw patients who were at risk for DVT. From 1994 to 2012, Dr. Voytas was on the medical staff in the geriatric division at Beaumont Hospital and was also an attending physician and medical director at Woodward Hills Nursing Home.

Dr. Huckins and Washtenaw filed a response to plaintiff's motion in which they argued that Dr. Huckins's and Dr. Voytas's active clinical practices were the same because they both devoted 100% of their time to the care and treatment of elderly patients. They argued that Dr. Huckins described her practice as "a skilled nursing facility specialist" under the broad umbrella of internal medicine. Dr. Voytas used the term geriatrics to describe his practice of taking care of patients 65 or older, which is a sub-specialty under the broad umbrella of internal medicine. Dr. Huckins and Washtenaw argued that it was undisputed that the majority of Dr. Voytas's clinical practice is exactly the same as Dr. Huckins's clinical practice. They further argued that either Dr. Huckins's and Dr. Voytas's practices were both 100% nursing home/subacute rehab under the umbrella of internal medicine, or, alternatively, considering what Dr. Huckins was actually doing at the time of the alleged malpractice, she was practicing geriatrics. They further argued that a physician does not have to be board-certified in a specialty to practice it. The purpose of the practice requirement is to prevent professional witnesses from testifying, but Dr. Voytas had a full-time practice at the time of the alleged malpractice. Dr. Huckins testified that she was a "skilled nursing facility specialist," and Dr. Voytas testified that the majority of his

practice was the same as what Dr. Huckins did. The relevant area of inquiry regarding the practice requirement is what the physician was doing at the time of the alleged malpractice.

Dr. Huckins and Washtenaw attached Dr. Huckins's deposition testimony, in which she testified that, in 2008, she joined Washtenaw Medicine, a primary care practice. Before that time, she was a skilled nursing facility specialist with St. Joseph Mercy Medical Group. Dr. Huckins is board-certified in internal medicine. She testified that, in 2009, she "was doing a full-time practice in several different nursing homes." She saw patients, including Linda, as an internal medicine physician. Her role was as the "doctor of record," which was similar to an attending physician. Dr. Huckins and Washtenaw also attached Dr. Huckins's affidavit, in which she averred that, in 2009, the average age of her patients was 80 and 88% of her patients were 65 years of age or older.

At a hearing on various pretrial motions, Dr. Kelley argued that he denied making the alleged statement to Linda and nothing in his records or the physical therapy records from the day before the October 13, 2009 appointment would support the presence of clots. Dr. Kelley further argued that plaintiff testified that Linda's brother drove her to the visit when the alleged statements were made and then drove Linda to Collins's house where she repeated the statement; however, Linda's brother denied taking her to the visit, Collins said that only Jackson was also present during the conversation (not plaintiff), and Jackson testified that she was not at Collins' home on that date. Dr. Kelley argued that the inconsistent testimony regarding the alleged statements showed that the testimony was inherently unreliable and should not be admitted. He also argued that the trial court did not have to wait until trial to make a ruling. Plaintiff responded that he should able to reference the conversation regarding Linda's ability to go to Florida without admitting hearsay. The trial court granted Dr. Kelley's motion and excluded any testimony about purported statements made by Dr. Kelley to Linda on October 13, 2009, regarding clots in her legs. The trial court found that it was not premature to make a ruling on what clearly constituted hearsay, but would rule on any other related evidentiary issues as they arose at trial. The trial court's order provided that "neither counsel nor any witness shall comment upon/refer to/or testify regarding alleged discussions as occurred between [Linda] and Dr. Kelley at the office visit of October 13, 2009 with respect to blood clots being in [Linda's] leg but that such clots would not move."

Regarding the motion to strike Dr. Voytas as an expert witness, the parties argued consistently with their briefs. Plaintiff also argued in rebuttal that there was no board specialty in nursing home practice. The trial court found that Dr. Huckins and Dr. Voytas practiced "the exact same medicine." The trial court stated:

[T]he fact of matter is that they were each practicing more than 50 percent of their time practicing medicine on elderly patients. We all know that Geriatrics is fundamentally Internal Medicine for older patients. So there is no question that Dr. Voitus [sic] is qualified. They were both internists--Internal Medicine Board-

-6-

certified and they're both doing the exact same kind of work, so motion is denied.[2]

At trial, plaintiff called three expert witnesses. Before Jackson's testimony, Dr. Kelley's counsel objected to Jackson giving diagnosis testimony, which he argued was not permissible. Plaintiff's counsel responded that Jackson would only testify to what she saw and did. Dr. Kelley's counsel requested that Jackson be prohibited from testifying about her discussion with Linda regarding Coumadin, which she argued was "expert testimony." Plaintiff's counsel responded that Jackson's statement to Linda that "you must be on Coumadin" was not hearsay and merely led to Jackson looking at Linda's legs. The trial court ruled that it would allow Jackson to testify regarding what she saw, but that her statement implied that Linda should be on Coumadin, which was "sort of [a] medical judgment." The trial court also ruled that Jackson could not testify that she told Linda that she could go and have a Doppler because such testimony was also a medical judgment and was not relevant.

Outside the presence of the jury, Jackson testified that she made a statement to Linda that she suspected she was on blood thinner after her surgery. When Linda said that she was not, Jackson was stunned because she works with numerous individuals who have had hip or knee replacements and 90% of the time they are on Coumadin or a blood thinner. After examining Linda's legs, Jackson encouraged Linda to go to the emergency room for testing. When Linda said she was going to see her doctor the next day, Jackson told her to show her doctor where it hurts. Jackson told Linda that the worst case scenario was a pulmonary embolism.

After plaintiff rested his case, plaintiff's counsel indicated that she had honored the trial court's ruling regarding conversations with Dr. Kelley about blood clots, but that she wanted to make a record of testimony that she would have elicited from plaintiff. She read plaintiff's deposition testimony in which he testified that he called Dr. Kelley on October 14, 2009, and Dr. Kelley confirmed that he told Linda that she had blood clots in her legs, but they would not move. Plaintiff's counsel also read Collins's deposition testimony in which she testified that Linda told her that Dr. Kelley said she had a blood clot, but he did not think it would not move. Plaintiff's counsel argued that his statement was not hearsay because he was the declarant, Dr. Kelley's statement was admissible as a party admission, and Collins's statement was admissible under MRE 803(24) (the "catch-all" hearsay exception). Dr. Kelley's counsel responded that the trial court properly ruled that such statements were hearsay and reiterated her argument that there was inconsistent testimony from the depositions regarding who was present when Linda's statements were made. The trial court stood by its rulings, finding that the statements were hearsay without an exception and there was no "inherent reliability factor in this instance."

Defendants presented the testimony of three experts at trial—Dr. Voytas testified regarding the standard of care applicable to Dr. Huckins, Dr. Casey Bartman testified regarding the standard of care applicable to Dr. Kelley, and Dr. Thomas Gravelyn testified regarding

---

[2] The trial court denied a similar motion filed by Dr. Huckins and Washtenaw to exclude plaintiff's expert, stating that "both sides are making way too much of an artificial distinction between--between nursing home medicine and medicine."

-7-

causation. The jury returned a verdict finding that neither Dr. Huckins nor Dr. Kelley was professionally negligent and the trial court entered a judgment of no cause for action in favor of Washtenaw, Dr. Huckins, and Dr. Kelley.

Following entry of the judgment, Dr. Huckins and Washtenaw filed a motion for case evaluation sanctions and taxable costs in the amount of $84,212.22. The trial court entered an order finding that plaintiff's counsel had first priority to any settlement proceeds and assets of the estate, Dr. Huckins and Washtenaw had second priority, the amount of taxed costs was $7,840, and the amount of case evaluations sanctions was $78,811.82.

After stipulation of the parties, the trial court entered an order dismissing Evangelical Saline *nunc pro tunc*, as of September 10, 2014. This appeal ensued.

II

Plaintiff first contends that the trial court erred by allowing Dr. Voytas to provide standard-of-care testimony because he was not qualified to do so under MCL 600.2169(1)(b). We disagree.

"This Court reviews for an abuse of discretion a trial court's determination of the qualifications of a proposed expert witness." *Chapin v A & L Parts, Inc*, 274 Mich App 122, 126; 732 NW2d 578 (2007). "An abuse of discretion occurs when the decision results in an outcome falling outside the principled range of outcomes." *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006). "Questions of statutory interpretation are reviewed de novo. *Id*.

MCL 600.2169(1) provides, in relevant part:

In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:

(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

(b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

In *Woodard*, 476 Mich at 560, the Michigan Supreme Court held that, under MCL 600.2169(1), "the plaintiff's expert witness must match the one most relevant standard of

-8-

practice or care—the specialty engaged in by the defendant physician during the course of the alleged malpractice, and, if the defendant physician is board certified in that specialty, the plaintiff's expert must also be board certified in that specialty." The Court further held that "a 'specialty' is a particular branch of medicine or surgery in which one can potentially become board certified." *Id*. at 561. Therefore, "if the defendant physician practices a particular branch of medicine or surgery in which one can potentially become board certified, the plaintiff's expert must practice or teach the same particular branch of medicine or surgery." *Id*. at 561-562. Moreover, "a 'subspecialty' is a particular branch of medicine or surgery in which one can potentially become board certified that falls under a specialty or within the hierarchy of that specialty," and is also considered a specialty. *Id*. at 562. The Court also stated that, under MCL 600.2169(1)(a), "the proposed expert witness must have the same board certification as the party against whom or on whose behalf the testimony is offered." *Id*. at 562-563 (citation and quotation marks omitted). The Court held that

> in order to be qualified to testify under § 2169(1)(b), the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the specialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty. [*Id*. at 566.]

In the companion case to *Woodard*, *Hamilton v Kuligowski*, the Court held that the proposed expert did not satisfy the practice requirement of MCL 600.2169(1)(b) where the defendant physician specialized in general internal medicine and was practicing general internal medicine at the time of the alleged malpractice, but the proposed expert did not devote a majority of his professional time to practicing or teaching general internal medicine in the year immediately preceding the alleged malpractice. *Woodard*, 476 Mich at 577-578. Rather, the proposed expert spent a majority of his professional time treating infectious diseases, a subspecialty of internal medicine. *Id*. at 556, 578.

A defendant doctor may, however, be practicing outside his or her area of board-certification at the time the alleged malpractice occurs. In *Reeves v Carson City Hosp (On Remand)*, 274 Mich App 622, 623, 628; 736 NW2d 284 (2007), the defendant doctor was board-certified in family medicine, but was working in the emergency room at the time of the alleged malpractice. The Court concluded that because the defendant doctor was practicing emergency medicine at the time of the alleged malpractice and could potentially become board-certified in emergency medicine, she was a specialist in emergency medicine. *Id*. at 628-630. Therefore, the Court held that the plaintiff needed a specialist in emergency medicine to satisfy MCL 600.2169. *Id*. at 630. The proposed expert was board-certified in emergency medicine, but the Court remanded for the trial court to determine whether the proposed expert devoted a majority of his professional time during the year preceding the alleged malpractice to the active clinical practice of emergency medicine or the instruction of students. *Id*.

There is no dispute that Dr. Voytas satisfied the requirement of MCL 600.2169(1)(a). Dr. Huckins was board-certified in internal medicine and Dr. Voytas was board-certified in internal medicine as well as geriatric medicine. At issue in this case is the practice requirement of MCL 600.2169(1)(b). Plaintiff contends that because Dr. Huckins testified that she was practicing

internal medicine when she treated Linda and, because Dr. Voytas testified that he spent the majority of his time during the relevant period practicing geriatric medicine, Dr. Voytas was not qualified under MCL 600.2169(1)(b).

Geriatric medicine and internal medicine are distinct specialties, as one can become board-certified in either and geriatric medicine is also a subspecialty of internal medicine. *Woodard*, 476 Mich at 561-562. "Internal medicine" is "the branch of medicine concerned with nonsurgical diseases in adults, but not including diseases limited to the skin or to the nervous system." *Stedman's Medical Dictionary* (28th ed). "Geriatric medicine" is "a specialty of medicine that is concerned with the disease and health problems of older people, usually those over 65 year of age. Considered a subspecialty of internal medicine." *Id*. Accordingly, if Dr. Huckins was practicing internal medicine at the time of the alleged malpractice and Dr. Voytas devoted the majority of his professional time during the year preceding the alleged malpractice to geriatric medicine, a subspecialty of internal medicine, then Dr. Voytas did not satisfy the practice requirement. See *Woodard*, 476 Mich at 577-578. However, Dr. Huckins and Washtenaw argue that, considering what Dr. Huckins and Dr. Voytas were actually doing at the relevant times, then either (1) Dr. Huckins was actually practicing geriatric medicine at the time of the alleged malpractice, or (2) Dr. Voytas was actually practicing internal medicine in the year preceding the alleged malpractice.

The trial court did not clearly identify the relevant specialty, but instructed the jury that the standard of care applicable to Dr. Huckins was that of an internal medicine doctor. We agree with the trial court and reject Dr. Huckins and Washtenaw's argument that Dr. Huckins was actually practicing geriatric medicine at the time of the alleged malpractice. As the above definitions show, geriatrics is not merely about the age of the patients—it relates to problems and diseases related to old age. Moreover, internal medicine is broad and may include the treatment of elderly patients. Accordingly, this case is unlike *Reeves*, in which the defendant doctor working in the emergency room was clearly practicing emergency medicine and not family medicine. See *Reeves*, 274 Mich App at 628. Rather, a doctor treating elderly patients in a nursing home could be practicing internal medicine or geriatric medicine. And in this case, there was no evidence that Dr. Huckins was dealing with problems related to old age, rather than practicing internal medicine with patients who were predominantly elderly. Accordingly, the trial court properly found that the applicable standard of care was that of an internal medicine physician at the time of the alleged malpractice.

Nonetheless, the trial court could have found that Dr. Voytas spent the majority of his time practicing internal medicine in the year preceding the alleged malpractice. Dr. Voytas's testimony that he predominantly practiced "geriatrics" is not conclusive of what he was actually practicing during the relevant period, particularly where he described his "geriatric" practice merely as "[t]aking care of people over 65." Again, the definitions show that geriatrics is about more than the age of the patient and Dr. Voytas testified that internists may also treat elderly patients. It is necessary to consider what Dr. Voytas actually did in his practice. In this case, Dr. Voytas predominantly treated patients 65 or older as a medical director and attending physician in a nursing home. Similarly, at the time of the alleged malpractice, Dr. Huckins was treating Linda, who was 65 years old, in a nursing home as the "doctor of record," similar to an attending physician. Both saw patients who were at risk for DVT. Although there was no further testimony regarding the particular issues, problems, or diseases that either doctor treated, the trial

-10-

court did not abuse its discretion in finding that Dr. Voytas did the same thing as Dr. Huckins, internal medicine, based on the record before it. Because Dr. Voytas spent a majority of his professional time practicing in the specialty of internal medicine in the year preceding the alleged malpractice, Dr. Voytas was qualified under MCL 600.2169(1)(b). Because Dr. Voytas was qualified, the trial court did not abuse its discretion in allowing him to testify at trial.

III

Next, plaintiff contends that the trial court committed error requiring reversal by refusing to admit the substance of his telephone conversation with Dr. Kelley on the day of Linda's death. According to plaintiff, he asked Dr. Kelley whether Dr. Kelley told Linda that she had blood clots, and Dr. Kelley said that he did. Plaintiff argues that his questions to Dr. Kelley did not constitute hearsay because they were not assertions. Plaintiff further argues that Dr. Kelley's response was exempt from the hearsay rule as a statement of a party opponent under MRE 801(d)(2)(A). We agree in both respects.[3]

"A trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo." *Albro v Drayer*, 303 Mich App 758, 760; 846 NW2d 70 (2014). "An abuse of discretion occurs when the trial court's decision results in an outcome falling outside the range of principled outcomes." *Dep't of Transp v Gilling*, 289 Mich App 219, 243; 796 NW2d 476 (2010).

" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "A 'statement' is (1) an oral or written *assertion* or (2) nonverbal conduct of a person, if it is intended by the person as an *assertion*." MRE 801(a) (emphasis added). We agree with plaintiff that his questions to Dr. Kelley were not assertions and, therefore, did not constitute hearsay. However, the questions alone, without Dr. Kelley's response, would not have been helpful to plaintiff's case, and the trial court's failure to admit plaintiff's testimony regarding the questions alone is harmless. See MCR 2.613(A). The determinative issue is whether plaintiff's testimony regarding Dr. Kelley's response, which was an assertion, was admissible as non-hearsay.

MRE 801(d)(2) provides that "[a] statement is not hearsay if--"

> The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity, except statements made in connection with a guilty plea to a misdemeanor motor vehicle violation or an admission of responsibility for a civil infraction under laws pertaining to motor

---

[3] Because plaintiff did not raise this issue at trial until after he rested his case, it is arguably unpreserved. See *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 443; 695 NW2d 84 (2005). Nevertheless, we exercise our discretion to review this issue because doing so is necessary to properly decide this matter and because the record is sufficient to permit our consideration of the legal questions involved. See *Smith v Foerster-Bolser Constr, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006).

vehicles, or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy on independent proof of the conspiracy.

The above rule "allows admission of a statement offered against a party when it is the party's own statement, in either an individual or a representative capacity." *Merrow v Bofferding*, 458 Mich 617, 633; 581 NW2d 696 (1998). The party seeking to introduce the statement has the burden of proving, by a preponderance of the evidence, that the alleged proponent actually said it. *Id.* at 633 n 14. But the fact that the alleged proponent denies making the statement "does not render the statement inadmissible[.]" *Bradbury v Ford Motor Co*, 123 Mich App 179, 188; 333 NW2d 214 (1983), judgment mod by 419 Mich 550 (1984). Rather, "if he denies it, a jury question of credibility is raised." *Id.*

Here, plaintiff laid a proper foundation regarding the source of the statement in question. Specifically, plaintiff testified unequivocally that the source of the statement was Dr. Kelley, who is a named defendant and therefore plaintiff's party opponent. It is true that Dr. Kelley did not recall plaintiff asking him any questions during the telephone conversation. Additionally, in his motion to exclude hearsay, Dr. Kelley denied having told plaintiff that he told Linda that she had blood clots. But Dr. Kelley's denial in that regard did not make plaintiff's proffered testimony inadmissible. Instead, the denial created a credibility issue that should have been submitted to the jury. Thus, the trial court erred by concluding that the testimony at issue was inadmissible. Such error resulted in an abuse of discretion. See *Kidder v Ptacin*, 284 Mich App 166, 170; 771 NW2d 806 (2009) ("A court by definition abuses its discretion when it makes an error of law.") (quotation marks and citation omitted).

Moreover, we cannot conclude that the trial court's error was harmless. In pertinent part, MCR 103(a) provides, "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]" Similarly, MCR 2.613(A) provides, in pertinent part, "An error in the admission or the exclusion of evidence . . . is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice." The testimony at issue here is directly material and presents an issue of witness credibility. As established by an offer of proof at trial, plaintiff would have testified that he called Dr. Kelley on October 14, 2009—the day the decedent died—and during that telephone conversation Dr. Kelley admitted that, during his appointment with the decedent the day prior, he told her that she had blood clots in her legs, but they would not move. If believed by the jury, plaintiff's testimony was evidence that just a day before the decedent suffered her fatal pulmonary embolism, Dr. Kelley was aware that she had blood clots in her legs but took no measures to treat the condition. Thus, we cannot conclude that the trial court's failure to admit the evidence was harmless. Consequently, we reverse the trial court's evidentiary ruling and remand for a new trial as to Dr. Kelley only.

IV

Plaintiff also argues that the trial court erred by refusing to allow Jackson to testify regarding her reaction to what she saw or her conversation with Linda regarding Coumadin on October 12, 2009. We disagree.

"We review for an abuse of discretion a trial court's decision to admit or exclude evidence. An abuse of discretion occurs when the trial court's decision results in an outcome falling outside the range of principled outcomes." *Gilling*, 289 Mich App at 243 (citations omitted).

Because Jackson was not qualified as an expert, the admissibility of her testimony is governed by MRE 701, which provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Plaintiff argues that Jackson's testimony was not relevant as a diagnosis, but was relevant because "even a person with her level of training and experience had serious concerns based on [Linda's] condition and the symptoms she was reporting." However, whether Linda should have been on a blood thinner, whether Linda should have gone to the emergency room to have a Doppler performed, and whether Linda was at risk for a pulmonary embolism are beyond the scope of lay knowledge. Jackson's excluded testimony itself showed that her statements about blood thinners were based on her specialized knowledge as a nurse, not merely her observations. Cf. *Mitchell v Steward Oldford & Sons, Inc*, 163 Mich App 622, 630; 415 NW2d 224 (1987) (concluding that the police officer's testimony "was not overly dependent on scientific, technical or other specialized knowledge"). Jackson's opinion was not helpful to the jury in determining whether Linda should have been on a blood thinner. Therefore, the trial court did not abuse its discretion in excluding Jackson's testimony. See *Gilling*, 289 Mich App at 243.

V

Next, plaintiff contends that the trial court erred by refusing to allow plaintiff and Collins to testify that Linda stated that Dr. Kelley told her, during the October 13, 2009 appointment, that she had blood clots, but they would not move. Plaintiff argues that such testimony was admissible under MRE 803(24). We disagree.

We note that plaintiff only argued below that Collins's testimony was admissible under MRE 803(24). Nonetheless, because the content of Collins's testimony regarding Linda's statement was the same as plaintiff's testimony, we are considering such testimony together, and the result would be the same under the plain error standard of review, we will consider this issue as preserved. "We review for an abuse of discretion a trial court's decision to admit or exclude evidence. An abuse of discretion occurs when the trial court's decision results in an outcome falling outside the range of principled outcomes." *Gilling*, 289 Mich App at 243 (citations omitted).

-13-

MRE 803(24) provides:

>A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact, (B) the statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts, and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of the statement makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

This Court has stated:

>MRE 803(24) is the "catch-all" exception to the hearsay rule. Evidence admitted under MRE 803(24) must satisfy four elements: "(1) it must have circumstantial guarantees of trustworthiness equal to the categorical exceptions, (2) it must tend to establish a material fact, (3) it must be the most probative evidence on the fact that the offering party could produce through reasonable efforts, and (4) its admission must serve the interests of justice." [*Detroit/Wayne Co Stadium Auth v Drinkwater, Taylor, and Merrill, Inc*, 267 Mich App 625, 651; 705 NW2d 549 (2005) (citation omitted).]

In considering "double hearsay," such as Linda's statement regarding what Dr. Kelley said at the October 13, 2009 appointment, each statement must fall within a hearsay exception. See *Solomon v Shuell*, 435 Mich 104, 129, 457 NW2d 669 (1990) ("Under MRE 805, hearsay within hearsay is excluded where no foundation has been established to bring each independent hearsay statement within a hearsay exception."). Therefore, in order for plaintiff's and Collins's testimony to be admissible, both Linda's statement and Dr. Kelley's statement must have satisfied the requirements of MRE 803(24).

Even assuming that the statements had circumstantial guarantees of trustworthiness and tended to establish a material fact, i.e., that Dr. Kelley was aware that Linda had blood clots on October 13, 2009, the statements were not the most probative evidence on that fact that plaintiff could produce through reasonable efforts. See *Detroit/Wayne Co Stadium Auth*, 267 Mich App at 651. Rather, Dr. Kelley's testimony and the medical records were the most probative evidence of whether Dr. Kelley knew that Linda had blood clots on October 13, 2009, both of which were produced at trial.[4] Moreover, given Dr. Kelley's argument regarding the inconsistencies in the testimony that she would have elicited, the admission of such statements would not have served

---

[4] This Court may not, however, consider whether the evidence produced at trial corroborates the statement. *People v Lee*, 243 Mich App 163, 178; 622 NW2d 71 (2000).

the interests of justice. Accordingly, the trial court did not abuse its discretion in excluding the testimony of plaintiff and Collins.

VI

Finally, plaintiff argues that because the trial court's judgment must be reversed, the trial court's award of case evaluation sanctions must also be reversed. Having concluded that remand for a new trial is necessary, we vacate the trial court's order granting defendants case evaluation sanctions.

Affirmed in part, reversed in part, vacated in part, and remanded for further proceedings consistent with this opinion. No party having prevailed in full, no costs may be taxed under MCR 7.219. We do not retain jurisdiction.

/s/ Kurtis T. Wilder
/s/ Mark T. Boonstra